IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Criminal No: 1:19-CR-183 |
| v. | ) | |
| | ) | |
| HAROON K. ULLAH, | ) | The Hon. T.S. Ellis, III |
| a/ka/ Haroon Kalimullah, | ) | Sentencing:  Nov. 22, 2019 |
| | ) | |
| Defendant. | ) | |

## POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING

In accordance with Title 18, United States Code, Section 3553(a), Rule 32 of the Federal Rules of Criminal Procedure, and Section 6A1.2 of the United States Sentencing Commission, Guidelines Manual (Nov. 2018) ("U.S.S.G." or "Guidelines"), the United States of America files this Position with Respect to Sentencing Factors in the instant case.

The United States has reviewed the Presentence Investigation Report ("PSR") and the computations of the United States Probation Officer ("USPO").  The United States has no objection to the PSR. Defendant Haroon K. Ullah ("Ullah" or "the defendant") is a criminal history category I.  The total combined offense level for Count 1 (Theft of Government Property) was properly calculated at 14 (before acceptance of responsibility).  With two points subtracted for acceptance of responsibility, the resulting offense level would be 12, which translates into an advisory guidelines incarceration range of **10-16 months**.

Given the seriousness of this offense, which was sustained over a period of at least nine months and involved substantial deceit, forgery, betrayal of trust, and the creation of multiple fake documents and associated identity theft, a term of incarceration is critical in this case. Because the

defendant has agreed to pay restitution in full and has agreed that he should serve time in jail, the United States joins the defendant's recommendation of **a custodial sentence of 60 days**; full restitution in the amount of $34,388.63, payable at the time of sentencing;[1] and an order of forfeiture in the same amount.[2] Such sentence is necessary to achieve the statutory purposes listed in 18 U.S.C. § 3553(a)(2).

## I.    Background and Offense Conduct

### A.    Defendant's Role with USAGM

The victim in this case, the United States Agency for Global Media ("USAGM"), is a federal agency of the United States government. It oversees the Voice of America, Radio and Television Martí, and various international media operations of the United States.[3] The defendant was its Chief Strategy Officer from October 1, 2017, until he was placed on administrative leave in October of 2018, and later terminated on April 2, 2019.  PSR ¶ 19. According to his online biography at the time, the defendant led "the Agency's policy engagement within the broader U.S. government as well as with key stakeholders outside the federal government. The CSO focuses on strategic planning and initiatives to make the Agency more strategically relevant in the national security, foreign affairs, and global media spheres." *Id*. at ¶ 19.  Before joining USAGM, Ullah had been employed with the U.S. Department of State since 2010. Ullah holds a Ph.D. degree, is a published author, and is a recognized expert in countering violent extremism. *Id*. USAGM had tapped Ullah to be one of its top leaders, and the agency had high hopes for him.

---

[1] This recommendation reflects a stipulated and joint sentencing agreement between the parties contingent upon the full payment of the restitution as described above. The government understands that the defendant will ask that the 60 days be served over approximately 30 weekends. The government will defer to the Court on how any such time is to be served.

[2] The proposed Restitution Order and Order of Forfeiture are attached to this brief.

[3] *See* https://www.usagm.gov/

B.    <u>Official Travel</u>

Due to his senior status at USAGM, Ullah exercised substantial discretion in his decisions to travel on official business. Even so, like all government employees, Ullah was authorized to travel by USAGM at government expense only for official business. PSR ¶ 21. Such official travel for Ullah's trips was arranged and authorized via E2 Solutions ('E2'). Within E2, travelers must certify that the vouchers and documents they submit are true and accurate and that the traveler has not previously received payment for the expenses. *Id*. Because Ullah had administrative staff submit his vouchers within E2, the staff printed out each voucher along with the receipts and the certification form for Ullah to sign in hard copy. *Id*. The defendant signed the certification form for each of his closed vouchers in E2. Each certification contained language, "this voucher is true and correct to the best of my knowledge and belief, and that payment or credit has not been received by me." *Id*.

C.    <u>Defendant's Offense Conduct Against USAGM</u>

During the period of February 2018 - October 2018, Ullah submitted for reimbursement multiple falsified hotel invoices; falsified taxi receipts; double-billed third party sponsors and USAGM for the same trips; and billed USAGM for personal trips, either to promote his book, or for week-end trips during which little to no USAGM business was conducted. PSR ¶ 22. Ullah used his government computer, a Microsoft Surface Pro, to create the false documents. He would obtain logos and other graphics online and use either an invoice generator or Microsoft Excel in order to create fraudulent hotel invoices. *Id*.

Examples of some of the defendant's creative skills in falsifying documents submitted to USAGM are attached hereto as **Exhibit A**. This exhibit captures his supposed official travel to Muscat, Oman and to Dubai, United Arab Emirates. In reality, the defendant visited his sister. Yet,

he concocted detailed invoices from hotels and rental car companies that he submitted for reimbursement to USAGM. Not only did Ullah obtain personal international air travel at government expense, but he lined his pockets with non-existent hotel stays and fake rental car receipts that he submitted to USAGM.

In order to obtain business class travel to which he was not entitled, Ullah took the extraordinary step of forging letters from a real medical doctor and supplying them to USAGM. Those letters falsely stated that Ullah required an upgrade to business class due to a sore knee, because he had to "lie flat" on long flights. PSR ¶¶ 25, 32. When interviewed by law enforcement, however, the doctor stated that he did not sign the letters, as was evident by a signature comparison; he pointed out errors in the letterhead; and made clear that Ullah's sore knee did not require such an upgrade, and that he would never have made such a recommendation. PSR ¶¶ 25, 32. **Exhibit B** contains portions of Ullah's request to USAGM for a reasonable accommodation in the form of business class air travel, along with several falsified letters from the real medical doctor that he submitted to USAGM.[4]

The defendant's sustained pattern of deception is evidenced by the number of falsified and fraudulent documents Ullah submitted to USAGM in 2018. Altogether, he submitted 33 separate falsified documents, not including five bogus business class upgrades based on the forged doctor's note. Altogether, the defendant intended a loss amount of $49,624.87 against USAGM. Because some of the vouchers the defendant submitted at the end of his tenure at USAGM were ultimately not fully reimbursed, the amount of restitution is $35,957.45, which mirrors the amount of forfeiture sought.

---

[4] The doctor's identity has been redacted. The doctor informed law enforcement that the logo at the upper right of the letter is not his medical practice. The investigation has shown that Ullah found this logo on the internet and pasted into the document. The redacted signature blocks contain legible signatures of the real doctor's name.

D.    <u>Defrauding Liberty Mutual Insurance Company</u>

The defendant used similar methods to defraud an insurance company at the same time that he was defrauding USAGM, submitting no less than 12 forged documents to Liberty Mutual Insurance Company. The defendant submitted a falsified home repair estimate and false lien release to Liberty Mutual Insurance Company ("Liberty Mutual") in connection with repairs to his home in Alexandria, Virginia, for tree damage. PSR ¶ 33.  As part of this scheme, Ullah used without lawful authority or permission the identity of a true real estate agent who works in the Eastern District of Virginia, in order to create the false construction estimate and lien release. *Id*. The defendant also falsified repair invoices that he submitted to Liberty Mutual, in order to minimize the amount he actually paid contractors to renovate and repair the home, and to keep the difference for himself. *Id*.

Ullah also submitted to Liberty Mutual an altered residential lease in order to maximize his insurance claims for living expenses to which he was not entitled. For instance, the defendant forged the leasing manager's name for the Park at Arlington Ridge Apartments as part of his fraudulent submission to Liberty Mutual Insurance. PSR ¶ 52. The document reflected the defendant and his wife signed a month to month lease to rent the apartment beginning June 8, 2018, to be reviewed month to month. PSR ¶ 36. The rent was reflected at $2,180 plus utilities. The defendant submitted the fraudulent lease to the insurance company indicating he and his wife needed to rent the apartment while repairs were done on their home on Seventh Street. *Id*. In addition to submitting reimbursement for rent based on the fraudulent lease, the defendant submitted for reimbursement for food and gas. *Id*. Examples of some of the defendant's artwork submitted to Liberty Mutual are attached hereto as **Exhibit C**.

In short, in the fraud on Liberty Mutual, the defendant used without authority the identities of two separate, real individuals, for the purpose of creating fraudulent documents. Through the submission of a dozen falsified and forged documents, Ullah defrauded Liberty Mutual of approximately $49,603.78 (on a total claim of $152,511.68), according to our conservative estimate. This amount is not counted as part of the loss under the guidelines, and is provided as relevant information for the Court under 18 U.S.C. § 3661.

E.    Sustained Pattern of Criminal Activity

Excluding the fraudulent business class upgrades, in the space of less than one year, Ullah created 45 separate falsified and forged documents that he used to obtain money from two separate entities: his own employer, USAGM, and his insurance company, Liberty Mutual. Under no circumstance can any of this be chalked up to a mistake or a misunderstanding of travel or insurance regulations. These are fabricated, fraudulent documents that the defendant himself created on a government computer. They involve the misappropriation of the identities of no less than three real individuals.

## II.    Guidelines Calculation

The Fourth Circuit has held that a sentencing court must: "(1) properly calculate the [Sentencing] Guidelines range; (2) allow the parties to argue for the sentence they deem appropriate and determine whether the § 3553(a) factors support the sentence[s] requested by the parties; and (3) explain its reasons for selecting a sentence." *United States v. Simmons*, 269 Fed. Appx. 272, 273 (4th Cir. 2008) (*citing United States v. Pauley*, 511 F.3d 468, 473 (4th Cir. 2007)). Although the Sentencing Guidelines are advisory, *United States v. Booker*, 543 U.S. 220, 246 (2005), "district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall v. United States*, 552 U.S. 38, 50 n. 6 (2007); *see Rosales-*

*Mireles v. United States*, 138 S. Ct. 1897, 1904 (2018) ("[E]ven in an advisory capacity the Guidelines serve as 'a meaningful benchmark' in the initial determination of a sentence and 'through the process of appellate review'") (citation omitted).  The USPO properly calculated the total offense level at 14 (before acceptance of responsibility) with a criminal history category of I.

A.    *Base Offense Level and Loss Amount*

The USPO correctly found that the total intended loss as to defendant was approximately $49,000.  The USPO correctly applied a six-level enhancement on top of the base offense level of 6, under §§2B1.1(a)(2); 2B1.1(b)(1)(D). The amount of loss is to be determined by a preponderance of the evidence. *United States v. Miller*, 316 F.3d 495, 503 (4th Cir. 2003). The Court need only make a reasonable estimate of loss. 18 U.S.C. § 3742 (e) & (f); USSG § 2B1.1, cmt. 3 (C).  The parties have also agreed that the loss is above $40,000, and the government asks the Court to find that the base offense level and the loss enhancements in the PSR and the Plea Agreement are correct.

B.    *Abuse of Position of Trust*

The parties stipulated that the defendant abused a positon of trust, due to his high-level position at USAGM, and, therefore, a two level enhancement applies under §3B1.3. PSR ¶ 4. This was part of an agreement not to seek an enhancement for sophisticated means. *Id*. The enhancement for abuse of position of trust is appropriate because the defendant's senior status gave him "substantial discretionary judgment" in scheduling his official travel. See §3B1.3, cmt. 1. Likewise, the defendant enjoyed "significantly less supervision" than most USAGM employees. *Id*.  The defendant's discretionary authority to schedule his own travel, combined with minimal supervision, contributed significantly to his commission of the offense. As the USPO stated, "[t]he defendant was an executive within the organization, who directed subordinates to process his

fraudulent travel vouchers knowing they were not likely to question his position or authority." PSR ¶ 39.

### C.    Acceptance of Responsibility

Although the United States shares the concerns of the USPO, the United States believes that the defendant has timely accepted responsibility for his role in the offense, meriting a two point reduction under § 3E1.1(a). The government also notes that the plea was part of a pre-indictment resolution of this matter.

### D.    Resulting Guidelines Calculation

After acceptance of responsibility, the United States believes that the applicable guidelines range is **10-16 months** because the defendant is a criminal history category I, with an adjusted offense level of 12.

## III.    The Imposition of Sentence

In addition to considering the properly calculated Guidelines range, the Court must also consider the other sentencing factors set forth in 18 U.S.C. § 3553(a). *See, e.g., United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005). In the Government's view, the most pertinent of those factors here are the nature and circumstances of the offense and the history and characteristics of the Defendant, 18 U.S.C. § 3553(a)(1); the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, *id*. § 3553(a)(2)(A); the need to afford adequate deterrence to criminal conduct, *id*. § 3553(a)(2)(B); the need to protect the public from further crimes of the Defendant, *id*. § 3553(a)(2)(C); the need to provide educational or vocational training or other corrective treatment for the Defendant, *id*. § 3553(a)(2)(D). In sentencing the defendant, "no limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a

court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661.

A.      *The Nature and Circumstances of the Offense and the Personal History and Characteristics of the Defendant*

Defendant Ullah is a very sophisticated person. He holds a Ph.D. degree and is the author of numerous books deemed worthy of publication by major university presses. He rose high in federal service in a relatively short period of time. He clearly has the full intellectual capacity to understand the consequences of his actions. Yet, over and over again, the defendant used his intellectual gifts to defraud USAGM, painstakingly creating false documents in order to increase his travel reimbursements and to conceal the fact that he was double-billing third parties and the government for the exact same travel. If life is about choices, then Ullah repeatedly chose falsehoods and lies during his time at USAGM, indeed, at least, 38 different times in connection with his travel reimbursements. And he chose to engage in the same pattern of fraud and deceit with his insurance company, Liberty Mutual, on 12 different occasions, causing that company a total estimated loss of nearly $50,000, based on the government's analysis.

It is true that Ullah has served his country well in the past, which is one reason why he was only charged with Theft of Government Property, not Wire Fraud, and not Aggravated Identity Theft. But past service should not be a get-out-of-jail-free card. Past service does not excuse the defendant's criminal conduct against USAGM and Liberty Mutual. Rather, the defendant's past service, in such a high-profile capacity, renders this fraud, committed for base pecuniary reasons, even more of a betrayal.[5]  For the reasons stated below, a period of incarceration is critical, given

---

[5] Likewise, the notion that previous traumatic events or an accumulation of life stresses somehow explains or mitigates this conduct is misplaced. Post-traumatic stress may explain self-medicating through excessive use of alcohol or drugs, and some of the associated problems we see with the abuse of those substances (e.g., drunk driving or a physical altercation). It may also explain domestic violence or other impulsive actions that harm self or others. But it is difficult to

the defendant's repeated and willfully fraudulent conduct over a period of nine months at USAGM, and for his similar pattern of fraud against Liberty Mutual.

    **B.**    *The need to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense*

This is a serious offense, not adequately reflected in the loss table in Section 2B1.1 of the Guidelines. To complete his crimes, Ullah told many affirmative lies, committed forgery on many occasions, and illegally used the identities of three other persons. As the PSR notes, with respect to the three different individuals, "the defendant created fraudulent letterhead pertaining to the victim and forged their name to the documentation without their knowledge or authorization." PSR ¶ 52.

For two of the individuals in question, Ullah placed them in professional peril. Thankfully for them, they were truthful with law enforcement and did not lie to protect Ullah. Had they done so, they could have faced negative consequences, as two of the three victims of identity theft held professional licenses in the subject matter of the forged documents. It is worth recalling that Ullah did all of this to obtain money and other benefits for himself, such as business class plane seats – not in the name of some noble cause. The arrogance of such conduct cannot be swept under the rug.

It is not as though defendant simply filled out a form incorrectly, or rounded up his travel expenses. No, the defendant painstakingly created fraudulent documents and practiced forging signatures of real individuals. Each time he used Microsoft Excel or Adobe Acrobat on his government computer to concoct a bogus hotel invoice, Ullah certainly had an opportunity to stop

---

see how it leads a senior official with substantial intellectual capacity, painstakingly to create multiple types of fraudulent documents; practice forged signatures; and then to profit off of the money received as a result of his deception — and all this over a period of many months.

and reflect on what he was doing. Rather than stopping out of shame, though, the defendant kept right on completing those fake documents, submitting them to USAGM, and falsely certifying that they were true and correct. And he did the same thing with respect to insurance estimates, contractors' invoices, a lease agreement, and other reimbursable items he submitted to Liberty Mutual. When one considers how many times Ullah used his government computer to fake a document, any suggestion that this was an isolated incident, or a lapse of judgment, is totally impossible to maintain.

Ullah's fraudulent conduct affected numerous USAGM employees. Not only did it personally hurt to have a senior official betray them, but Ullah's fraud undermined the credibility of what is, basically, a news-gathering and broadcast organization. That is another important reason why justice demands a meaningful term of incarceration. The employees of USAGM are watching the outcome of this case and hope to see meaningful justice done.

      C.    *The Need for Specific and General Deterrence*

This is a case in which specific deterrence requires a period of incarceration in the Bureau of Prisons. While it is true the defendant has suffered collateral consequences, such is true of most white collar defendants. Here, the defendant's history of repeated and calculated acts of deception indicate that he poses a real risk of recidivism. When presented with a tempting situation in the future, the defendant will be well-served if he can draw upon some time in a prison jumpsuit to fully appreciate the need to refrain from cheating and lying for money.

Finally, in terms of providing general deterrence to the public, the proposed split sentence in this case will send a message that high ranking government officials do not have a license to steal. A purely probationary sentence, in the face of such sustained and egregious criminal activity, frankly, would not bode well for the defendant's future risk of recidivism.

## IV.    Conclusion

For all of the above reasons, the government respectfully requests that this Court impose a sentence **of 60 days in jail**; full restitution in the amount of $34,388.63, payable at sentencing; and an order of forfeiture in the same amount.[6] Such sentence is appropriate to sufficiently address the nature and circumstances of the offense and the history and characteristics of the defendant; to reflect the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense; to protect the public from further crimes of the defendant; and to satisfy the other sentencing purposes set forth in 18 U.S.C. § 3553, including general deterrence.

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney

_____/s/_____

Russell L. Carlberg
Counsel for the United States
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Telephone:  703-299-3700

---

[6] Moreover, the defendant agreed to forfeiture and restitution in the plea agreement. Forfeiture and restitution are both mandatory in this case. The government will ask that the Court announce at sentencing that the defendant be ordered to pay restitution and forfeiture as part of its judgment. Given the defendant' substantial net worth, the government asks that he be ordered to pay restitution in full forthwith, which the government understands he intends to do.

**CERTIFICATE OF SERVICE**

I certify that on this 18th day of November 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to counsel of record.

<div style="margin-left: 40%;">

_____/s/_____

Russell L. Carlberg

Special Assistant United States Attorney (LT)

United States Attorney's Office

Justin W. Williams U.S. Attorney's Building

2100 Jamieson Avenue

Alexandria, Virginia 22314

Phone:  (703) 299-3700

Fax:  (703) 299-3982

Russell.L.Carlberg@usdoj.gov

</div>