**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**

**Alexandria Division**

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Criminal No. 1:19-cr-183 |
| HAROON K. ULLAH, | The Hon. T.S. Ellis, III |
| Defendant. | Sentencing: November 22, 2019 |

## HAROON ULLAH'S MEMORANDUM IN AID OF SENTENCING

Dr. Haroon Ullah respectfully submits the following Memorandum in Aid of Sentencing to the Court to support the joint recommendation of the parties for a sentence of sixty days, with a request that the sentence be served over twenty (20) consecutive weekends. The Court understands better than most the need for the determination of an individualized assessment of the factors set forth in 18 U.S.C. § 3553(a) to determine an appropriate and just sentence.

The totality of the circumstances in this case warrant a variance, on this the parties agree. However, while it is counsel's position that the § 3553(a) factors overwhelmingly favor a below-Guidelines sentence that does not involve prison, the government believes that justice requires a brief period of incarceration. Accordingly, Haroon has agreed to a sentence of incarceration. As he has done at every step of this investigation, he has accepted responsibility, admitted his crime, been completely and fully transparent about his misconduct and never once shied from the significant consequences of his actions.

Haroon has done what can be most difficult, he has admitted what he has done to his family, to the government, to this Court and to himself. He has fully accepted the consequences of his actions and even when faced with the massive public shaming that has come and with the loss of

his career and likely any meaningful professional future, he has never once deviated from his choice to sit down with the government, look them in the eye and admit what he has done.

Now, rather than seek a probationary sentence, which would be wholly appropriate given the totality of the circumstances of his life and the conduct, Haroon has still chosen to accept the government's offer of a sixty (60) day sentence of incarceration. Over the objections of so many in his life who know the truth of his service to the United States, Haroon has agreed to not request a probationary sentence. The government has asked for "time in a prison jumpsuit" and Haroon has agreed, despite the fact that he presents no risk of committing future crimes, and the public fall from grace that he has suffered has already reverberated to adequately deter others from pursuing a similar course of conduct. Haroon has no prior criminal record, and the facts of this case and Haroon's family and life history demonstrate the infinitesimal risk that Haroon will ever reoffend and there is no need for the Court to be concerned about potential future crimes.

While probation would be the minimum sentence necessary to comply with the sentencing purposes set forth in § 3553(a)(2), Haroon understands and accepts that the recommended period of incarceration is warranted as punishment for his conduct. This case has had a tremendous impact on Haroon in marking him for life as a convicted felon. There is no need for more retribution, further deterrence, or incapacitation. Grace is certainly warranted in this case.

## BACKGROUND

Haroon Ullah's background is exceptional. Born in Canada to Pakistani immigrants, he was brought to Eastern Washington as a toddler for his father's job as a nuclear engineer with a Department of Energy contractor. A standout student who skipped grades and excelled at sports, he was in every way an All-American kid. He won a scholarship to attend Whitman College,

followed by the Thomas J. Watson Fellowship which took him to the Middle East and England.[1] Haroon returned from his fellowship focused on public service and committed to making a change in the world. He had seen a number of countries and was focused on making the world a safer place and bringing the best of America to the rest of the world. Accepted in the prestigious John F. Kennedy School of Government at Harvard University program for a Master's Degree in Public Administration, Haroon moved to Boston. From Harvard, Haroon did a Fulbright Scholarship in Morocco. Haroon then returned from Morocco and continued his studies with a PhD program at the University of Michigan in public policy and political science.

Having eschewed the riches of the private sector for his public policy passion, Haroon graduated from the University of Michigan and relocated to Washington DC to join the United States Department of State ("State") as a member of Ambassador Richard Holbrooke's Afghanistan-Pakistan team. It was with his work at State that Haroon really started to make a difference. As an expert in terrorism, radical Islam and related areas of the utmost importance to United States security and world events, Haroon was stationed in Islamabad.

The Court has before it many letters that speak, certainly better than counsel could ever try, to the exceptional work that Haroon did for the United States and its allies during his time in Islamabad.[2] He won awards, created programs and made a real impact. It was the culmination of so many years of training and hard work, and the launch of what promised to be a spectacular career. Working side by side with Generals, Admirals and Ambassadors, Haroon was being pulled into every significant development in American foreign policy in the region. He was a trusted advisor, a valuable member of the team and doing what he wanted to do, making a real difference and protecting Americans and advancing America's interests around the world.

---

[1] https://watson.foundation/fellowships/tj
[2] See Attachment 1 – letters of support for Haroon Ullah.

Haroon came back to the United States and his star continued to rise.  Professionally, outwardly, Haroon was a smashing success.  Unfortunately, as is often the case, there was more going on.  In addition to the stress of his overseas posting (constant bombings, being held at gunpoint, constantly being followed and potentially targeted), Haroon suffered a number of personal tragedies.

Haroon's youngest brother, Muneer, passed away in 2016.[3]  The loss was devastating and unmooring.  During the same time frame, Haroon went through a very difficult and contentious divorce before serendipity intervened and he became reacquainted with Naba Sharif and remarried.  Unfortunately, Naba and Haroon suffered their own series of challenges with the loss of a pregnancy and the tragic circumstances where Naba's mother suddenly slipped into a coma, on the same day that they learned they were pregnant again.  While the joy of their daughter, now ten months old, is their greatest accomplishment, Naba's mother's condition seems to worsen by the day and even when they were able to cobble together money to buy a home for their growing family, a storm knocked a tree into the house destroying the roof and making it uninhabitable for the better part of a year.[4]

## OFFENSE CONDUCT

There is no denying the facts of his conduct.  Haroon has not once denied that what he has done was wrong and he understands deeply how he has hurt so many people around him with his actions.  From his wife and parents and extended family, to his mentors and colleagues, he has

---

[3] Muneer Ullah lived a life of challenges.  Born with Down Syndrome and a congenital heart defect, Haroon and his family spent many years in hospitals and with various specialists while Muneer fought a series of serious health ailments.

[4] None of these personal circumstances are offered as an "excuse" or an "explanation" of Haroon's misconduct.  There is no justification being offered for his misconduct.  He did what he has pleaded guilty to and has accepted responsibility and will continue to do so.  These additional facts, not thoroughly explained in the comprehensive Presentence Investigative Report (PSR) are offered for context.  Insight into the various significant stressors in Haroon (and Naba's) lives which certainly are a factor in the path he went down during the months at issue.

shamed himself and brought dishonor on them through his conduct. He has admittedly even hurt the message he cared so deeply about, combating violent extremism. For when the messenger has lost credibility, so too has the message.

Having dedicated his life to service and having sacrificed so much to turn back the tide of violent extremism in the Middle East, he is shattered to believe that he has undone so much hard work and to know that he is no longer a valued contributor to the mission. Being unable to continue to contribute is one of the hardest things Haroon has had to accept.

Haroon ruined very important friendships with his misconduct. The "doctor" whose name he used was one of his closest friends. They were in each other's wedding parties and had a relationship like brothers.[5] Haroon has admitted that his degenerative knee condition did not warrant the upgrades he obtained by using the fraudulent doctor's note. The upgrades, which represent the bulk of the loss, are inexplicable and certainly not something that he is trying to explain away with traumatic stress or life events. He did it, it was wrong and he never should have done it.[6]

But as explained more fully below, as covered by the multiple letters of those who have lived and worked with Haroon and as considered by the parties with their joint recommendation, this case does not call for a guideline sentence or anything close to it.

---

[5] As had the government, counsel has redacted the doctor's name from the pleadings. The parties are both fully aware of the identity and if the Court requires it for any reason, would be happy to provide it to the Court under seal.

[6] While the government indicates in its filing that trauma does not cause otherwise law abiding individuals to commit fraud, that position is not as clear as the government would have it. There are many ways, often illogical and seemingly incongruous that people react to serious stress and trauma. None of those reasons, however, are being offered as justification for Haroon's conduct and equally importantly, he is working through his issues now in a constructive and open way with those who love him and care for him and there are coping mechanisms and support in place now going forward.

*USAGM*

Haroon submitted numerous false documents to his employer, attesting to their accuracy, for reimbursement. Haroon submitted a false letter to get "upgrades" on flights, which are the bulk of the loss calculation agreed to with the government. He took trips that involved detours for personal reasons, including detouring return flights to New York rather than DC to meet his wife to see his mother in law. He did this, he has admitted it and there is no argument that this was proper.

Haroon has borrowed money from family members and is paying the entire restitution amount in advance of sentencing, as agreed.[7] He clearly obtained monies to which he was not entitled, he obtained expensive flight upgrades that were unjustified, and he has no excuse for having done so.

*LIBERTY MUTUAL*

Haroon used the name of his close friend, the "real estate agent" to submit false documents to his insurance.[8] There is no excuse for this conduct. It was wrong, it was inexcusable and it has caused the loss of another close friend, the "real estate agent," through this improper conduct.

---

[7] The restitution amount was originally $37,082.49. After further investigation it was reduced to $35,957.45. It was then finally reduced to $34,388,63. It is still the position of counsel that other trips which the government has identified as personal, London and Concordia, were actually USAGM business, which would further reduce the restitution slightly. However, there is no dispute that even on those trips, Haroon obtained fraudulent upgrades.

[8] There is no dispute that Haroon submitted false invoices to Liberty Mutual during the rebuilding of his home. However, what is clear is that Liberty Mutual suffered zero (0) loss. The government is aware that Liberty Mutual paid out the claim to repair the Ullah's home for the same amount as the estimate provided by their own contractors. The damage was legitimate, the repairs were done, but because multiple contractors were used, Haroon created false receipts rather than spend the time and energy to properly document the repair costs. The issue for the living expenses is similarly not a loss to Liberty Mutual. The house was uninhabitable and therefore they were unable to move in. As a result, they paid the mortgage on the home that was under repair and stayed in their apartment, thus having two payments. The insurance policy covered "loss of use" and while admitting that the documents were false, there was no loss to the insurance as the false lease was for the actual cost of the rental. This was in fact fraudulent, but resulted in no loss. Which, without question makes the fraud related to the insurance the most ridiculous fraud imaginable, a fraud for no benefit.

Haroon does not and has not denied submitting multiple false documents to Liberty Mutual. He does not deny this fact, nor has he attempted to minimize this conduct. He falsely used his "real estate agent" friend's name and signature as a contractor and there is no acceptable explanation. He did it out of laziness and for ease. He did not do it to defraud Liberty Mutual, as he did not inflate the costs or make claims for work that was not done.[9]

**Guideline Calculations**

Although the Supreme Court declared the Guidelines advisory, we recognize that the Court is obligated to compute the relevant sentencing range under the Guidelines when completing its sentencing analysis. *United States v. Green*, 436 F.3d 449 (4th Cir. 2006).

> "[T]o sentence a defendant, district courts must (1) properly calculate the sentence range recommended by the [s]entencing [g]uidelines; (2) determine whether a sentence within that range and within statutory limits serves the factors set forth in § 3553(a) and, if not, select a sentence that does serve those factors; (3) implement mandatory statutory limitations; and (4) articulate the reasons for selecting the particular sentence, especially explaining why a sentence outside of the [s]entencing [g]uideline range better serves the relevant sentencing purposes set forth in § 3553(a)."

All parties agree with the Probation Office that the Total Offense Level under the Guidelines, pursuant to the Plea Agreement entered in this case is 12; and Haroon's criminal history category is I. For the reasons explained more fully below, consistent with the agreement between the parties, a significant variance is warranted and the sixty (60) day sentence, served on twenty (20) consecutive weekends, is the appropriate sentence for the Court to impose.

While there is no disagreement between the parties and probation over the guideline calculation, it is important to note three areas of clarification from the PSR. These are not substantive objections, but rather clarifications for the Court.

---

[9] See Attachment 2 - Initial estimate $92,818.27, July 16, 2018 estimate of Paul Davis Restoration & Remodeling at Page 17.

First, with regard to Haroon's mental health treatment. As the Court is aware from our September 20, 2019 status hearing, Haroon has been seeking counseling.[10] The Court may recall that the PSR indicated that Haroon "conveyed he had no history of mental health illness or mental health counseling" when questioned during the telephonic interview conducted prior to his arraignment and plea. This is inaccurate. Haroon has been fully and completely transparent and truthful during every stage of the proceedings in this case.[11] It is only raised to make sure the Court is aware that Haroon has been extremely open and truthful during the pendency of this matter. Had he been asked, there is no doubt he would have disclosed the fact of his counseling.[12]

Second, the PSR indicates that Haroon "failed to surrender" his passport. To be clear, so the Court does not think there was any issue, Haroon has not been able to locate his personal passport since his last trip overseas many months before. He did locate his Diplomatic Passport, which although not requested, was turned over as ordered. Counsel asked for more time for Haroon to continue searching for the passport, rather than reporting it lost and having to go through the application process for a new passport. He was not able to find his passport by the end of July, so a report was filed indicating that it was lost. Again, he did as advised by counsel and there was never any attempt to do anything improper and certainly not to "fail" to surrender his passport as ordered.

Third, the PSR does not credit Haroon's acceptance of responsibility. This is an

---

[10] Two letters from treating counselors for Haroon Ullah are being submitted separately under seal for the Court's consideration.

[11] Haroon was not questioned about mental health history during the call. Counsel was aware that he was in counseling long before the plea agreement was entered. In fact, it had been discussed at length when the government was considering a Deferred Prosecution Agreement (DPA) rather than a criminal charge. The government and counsel had spent months working on the terms of the agreement, Haroon was not a flight risk and it was clear that nobody was seeking his detention. The call itself only lasted a few minutes and the subject was never broached during the call. Undersigned counsel initiated the call in question and was on the call for its entirety.

[12] However, it is important that as happened later when the question was asked following the plea, counsel would have given the same advice that was ultimately given, which gave rise to the September 20th hearing. The

unsupportable determination.  Haroon Ullah has accepted responsibility in every way.  From the moment he was contacted regarding this investigation, he has admitted his misconduct and accepted responsibility.  Haroon appeared, with counsel, for an extensive proffer session with the United States Attorney's Office and the Inspector General for State.  During a meeting with two Special Agents and an Assistant United States Attorney, Haroon walked through virtually every false document submitted.  He admitted, no less than thirty times that he had committed the offense as ultimately charged.

Haroon accepted responsibility, admitted his conduct, apologized and agreed to work out a resolution to the conduct, ultimately resulting in the instant plea that is before the Court.  During his interview for the PSR, Haroon again accepted responsibility for his conduct, admitted again that he was guilty and that he had in fact done what he had already pleaded guilty to.  However, when asked to go transaction by transaction through the conduct and to explain the minutia of each instance of misconduct, on the advice of counsel, Haroon did not do so.[13]  Importantly, however, "The Probation Office does not dispute the fact that the defendant has repeatedly stated to this writer and his supervising pretrial officer that he accepts responsibility for his conduct and expressed a desire to implement changes in his life to do better in the future."  PSR at 25, Dkt. No. 23.

## ARGUMENT

Correctly calculating the applicable Guidelines range is only the first step – "the starting point and the initial benchmark" – in determining the appropriate sentence.  *Gall v. United States*,

---

[13] In over twenty years of criminal defense representations, counsel only once permitted a client to give a detailed statement to a PSR writer on the acceptance of responsibility.  The one time, the Washington DC PSR writer made myriad mistakes and then disputed the facts during the sentencing phase.  Since that time, counsel has never, in any jurisdiction or any case, permitted a client to attend a PSR interview unaccompanied and never permitted a client to give a detailed statement of acceptance of responsibility to a probation officer.  This is the first and only time that the PSR writer has chosen to take the position that a client who has proffered, plead, and admitted guilt has not "accepted responsibility."

552 U.S. 38, 49 (2007).  The second step is to decide whether "an outside-Guidelines sentence is warranted."  *Id.* at 50.  Before making this decision, the Court must give the parties an opportunity to argue for "whatever sentence they deem appropriate" and "then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party."  *Id.* at 49-50.  Most fundamentally, the second step requires the Court to "make *an individualized assessment* based on the facts presented" to decide whether to vary from the Guidelines range.  *Id.* at 50 (emphasis added).

The factors set forth in § 3553(a) to the specific circumstances that Haroon's situation presents demonstrate that a substantial variance is warranted and the agreed upon sixty (60) days, is an appropriate sentence.  While the government has deferred to the Court on the manner in which the time is served, it is for the following reasons respectfully requested that the time be served on twenty (20) consecutive weekends.

**The § 3553(a) Factors Overwhelmingly Favor A Below-Guidelines Sentence**

### *§ 3553(A) (1) – The Nature And Circumstances Of The Offense And The History And Characteristics Of Haroon Ullah*

Under § 3553(a)(1), the Court must consider "the history and characteristics of the defendant."  This factor strongly supports a sentence below the Guidelines range that does not send Haroon to prison.  Haroon's personal history and characteristics make it highly unlikely (inconceivable, really) that he will commit a crime in the future.  Under this sentencing regime, a court should consider all of the relevant sentencing factors, giving no more weight to one factor than to any other factor. The focus is a sentence based on the whole person before the sentencing court, rather than simply the version of the person reflected in the numbers and grids of the Guidelines.

Here, focusing on the whole person means sentencing Haroon on the basis of his entire life and not just this crime.  It does not take much to see what this case has done to Haroon's life.  Every possible avenue of his professional life has been foreclosed.  He has lost all teaching and lecturing positions, his book is unsellable, he was fired by State, he is a felon for the rest of his life and his reputation is destroyed.  If not for the kindness of a former employer/friend, he would have no job at all.[14]

### § 3553(A) (2) (B) – The Need For The Sentence To Afford Adequate Deterrence To Criminal Conduct

As stated above, the felony conviction itself has a chilling effect on Haroon and any other individual tempted to engage in such a scheme.  While Haroon understands the seriousness of his conduct, a jail sentence on top of these other repercussions is unnecessary and will have a deleterious effect on his ability to put his life back together.  Haroon has learned so much from his involvement in the instant offense and has already been significantly punished.

"[D]istrict courts have routinely considered a defendant's age as part of their [sentencing] analysis on the ground that older defendants exhibit markedly lower rates of recidivism compared to younger defendants."  *United States v. Green*, No. CR-2-00-106 001, 2007 WL 869725, at *2 (S.D. Ohio Mar. 20, 2007).  "[O]ffenders *between 26-30* have a recidivism rate of 13.3 percent" and "*[r]ecidivism rates decline relatively consistently as age increases.*"  U.S. Sentencing Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* 12 (May 2004) (hereinafter "*Measuring Recidivism*"), *available at*

---

[14] Even when providing exceptional training, once customers learn of Haroon's conviction they refuse to work with him, making even his current position extremely tenuous.  While PSR was not changed to reflect Haroon's diminished future earning ability because he was able to find this position, his hold on this position is uncertain.  Even if he does keep the job and he does earn "at least $1,000 per engagement" the best he could ever hope for is an engagement every week (which will never happen) and a maximum compensation of $52,000 per year, a fraction of his prior earning ability.  PSR at 26.

http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-

publications/2004/200405_Recidivism_Criminal_History.pdf (emphases added).

Moreover, offenders of *all* ages who have zero criminal history points have two-year

recidivism rate of only 3.6% for conviction of a new crime. *See id.* at 23. Haroon has no criminal

history *and* is older than the average first time offender (41), so the likelihood that he will commit

a future crime is "minimal." This is sure to be his only involvement with the criminal justice

system.

Also, considering the consequences of his conviction, separation from his wife and baby

daughter, it is clear that there is no need to send an additional message to Haroon as to the lunacy

of his misconduct.[15]

### § 3553(a) (2) (C) and (D) — *The Need for the Sentence to Protect the Public from Future Crimes by Dr. Ullah*

We submit that Haroon poses absolutely no future threat of any criminal wrongdoing and

there is no need for a jail sentence to protect the public from him. However, Haroon has agreed to

the joint recommendation for a sixty (60) day sentence and we ask the Court to endorse that

agreement and permit him to maintain his employment, care for his daughter and assist and support

his wife and family during this difficult time. The facts of this incident are unique and there is no

reason to believe he will ever have a similar opportunity again, nor would he ever misrepresent a

document or submit a false claim; he has certainly learned his lesson and would not be at risk to go

down this same road a second time. This was his first and only foray into activity of this kind. Now,

having his life ruined, becoming a felon, facing jail and having destroyed his career, is a punishment

beyond what is necessary to protect the public.

---

[15] It is particularly difficult during this time for Haroon and Naba and their family as she struggles to return to full time work to support their family, while caring for an infant, and they remain focused on helping with the care of her mother, who could pass at any time.

These factors make Haroon an especially strong candidate for avoiding any further involvement with the criminal justice system.

### § 3553(A) (3) And (4) — The Kinds Of Sentences Available

The Court will be properly exercising its authority by imposing the jointly recommended sentence. There is no need for additional punishment beyond the public humiliation, felony conviction, career destruction and impact on his life. Incarceration in this case serves no real additional purpose, other than to further jeopardize his ability to financially contribute to his family and share the child care responsibilities for their baby.[16] A probationary sentence is all that is needed to promote respect for the law and assure that there will be no "next time" for Haroon, but he has agreed to a jail sentence and asks the Court to accept the parties recommendation.

A first felony conviction is a significant event and is more than sufficient to promote the stated goals of sentencing. If, however, the Court believes an additional punishment is warranted, beyond the agreed upon sixty (60) days, the period of supervised release will serve the purpose of a significant additional punishment.

Section 3553(a)(3) obligates the Court to contemplate "the kinds of sentences available." As the U.S. Supreme Court has recognized, "§ 3553(a)(3) directs the judge to consider sentences other than imprisonment." *Gall*, 552 U.S. at 59. Sentences other than imprisonment are available here, but are not being sought. The parties have an agreement that is fair and appropriate. The

---

[16] The requested weekends would permit a schedule that allows Naba to see patients in her pediatric practice on Monday, Tuesday and Friday (mornings). Haroon would watch their daughter while she works in her part-time practice. On Tuesday evenings (when he has an engagement) Haroon would travel to the training and conduct the trainings on Wednesday and Thursday, returning home on Thursday evening and watching their daughter Friday morning. Friday afternoon he would report to the Alexandria Adult Detention Center (ADC) where he would be incarcerated until Sunday.

sentencing purposes that § 3553(a)(2) permits the Court to order the requested sixty (60) day sentence, to be served on weekends in the ADC.

Section 3553(a)(2) requires the Court to take into account "the need for the sentence imposed--"

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

> (B) to afford adequate deterrence to criminal conduct;

> (C) to protect the public from further crimes of the defendant; and

> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2). "These four considerations – retribution, deterrence, incapacitation, and rehabilitation – are the four purposes of sentencing generally, and a court must fashion a sentence 'to achieve the[se] purposes . . . to the extent that they are applicable' in a given case. *Tapia v. United States*, 131 S. Ct. 2382, 2387 (2011) (quoting 18 U.S.C. § 3551(a)) (alteration and omission in original).

A sentence involving incarceration is not necessary to promote any of the purposes set forth in § 3553(a)(2). No more retribution or deterrence is warranted. Given what he has gone through already and his personal history and characteristics, Haroon presents as low a risk of recidivism as can be imagined. Rehabilitation is not an issue here. Accordingly, the agreed upon sentence is sufficient but not greater than necessary to comply with § 3553(a)(2)'s sentencing purposes.

## CONCLUSION

The § 3553 factors tilt decisively in favor of a sentence that involves no imprisonment. This case is serious and nobody is asking that the conduct be "swept under the rug." On the contrary, Haroon has handled this matter with character and has never once run from the

14

consequences.  He has been open and forthright with everyone around him, owning his misconduct, admitting to it and making no excuses.  He has lost a great deal, but he is moving forward and trying to earn the trust and the support of those who still are willing to believe in him.

Everything that he has said and done is consistent with admitting his misconduct.  He has admitted to everything, he has tried to make amends by repaying the monies improperly received, and he is in the community being open about his actions and seeking redemption and forgiveness. He is working as hard as he can to care for his family by trying to provide, rebuild a career and care for his daughter.  He is a good man and because of his crimes, he is going to spend the rest of his life proving that truth.

Haroon presents no risk of committing a future crime because of specific characteristics and a lifetime of law abiding behavior, and his desire to care for and provide for his family.  More importantly, Haroon knows that there is no room error.  He will not be given another chance.

For the foregoing reasons, the Court should sentence Haroon to a period of sixty (60) days incarceration in the Alexandria Detention Center, served on twenty (20) consecutive weekends. This is consistent with the interests of justice and the stated goals of sentencing.

November 21, 2019                              Respectfully submitted,


    /s/ Mark E. Schamel
Lela Marie Ames (75932)
Mark Elliott Schamel (*pro hac vice*)
Womble Bond Dickinson (US) LLP
1200 19th Street, NW, Suite 500
Washington, DC  20036
Tel.: (202) 857-4481
Fax: (202) 261-0098
E-mail:lela.ames@wbd-us.com
E-mail: mark.schamel@wbd-us.com

*Counsel for Haroon Ullah*

15

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 21st day of November 2019, copies of the foregoing document were filed through the Court's ECF system, which will provide notice to all parties indicated on the electronic filing receipt.

<u>/s/ Lela Marie Ames</u>